So he talked to a fellow by the name of John Norman, and John Norman said, Hey, contact my friend and client down in Texas, Goodworth Holdings, Chris Ainsworth, maybe he can help you. It's that simple. And what were they going to do? They needed to find some money. They needed to find some financial underwriters to make this thing happen. It was a state-of-the-art deal. There was a big currency problem in South Korea. Everybody knew about all of the East Asia problems, financial problems at that time. And so it was an ideal opportunity for a man who had been a teacher and a CPA and other things to become a CEO. You could tell it was his life dream. On the other hand, my client was a young guy, 30 years old, had been a broker at Dean Witter and decided to break off on his own and start a hedge fund business. And he's gone the same way most of the other hedge fund managers have. But at the same time, he did have some contacts because he was working with Hambert & Quist, now J.P. Morgan. I'll call it Hambert & Quist if that's okay, since that's the parties that they were dealing with at the time. The parties informally dealt with one another, and then the evidence is, from my side of the docket, that by the end of 1998, early 1999, there was an agreement to split profits 50-50. Well, these are two relatively stump-broke people. Splitting 50-50 is not unbelievable, as the district judge said. And my guy was going to facilitate, provide legal counsel to the extent necessary and get Dr. Suh's proposal introduced to the money. No doubt about it, that's what they talked about. Also, there's no doubt that there is absolute, unequivocal testimony in this record that the deal was 50-50 split, that because their expenses were about the same, they would pay their own expenses, and they would shoot for the moon 20% of whatever the acquiring financial underwriting group got. It really is pretty simple there. But it breaks down pretty quickly. With the lawyers sending the proposal after a nondisclosure agreement is signed by Hambert & Quist, and they draft it, and they say, we won't use this information, we won't disclose it without your prior permission. So with that, business plan goes. And a couple of weeks later, the answer comes back, we don't have any interest, but we have a group that might be, H&Q Asia Pacific does investment in this area. Can I send the plan to them? My guy says, unequivocally, do I need another confidentiality agreement? He's little. There's no way. And he says in his affidavit, there's no way I could chase somebody in Korea or overseas. He wanted to be protected. And Mr. Boffman tells him from H&Q, you don't need another one, your nondisclosure agreement covers you here and on our affiliates. Well, that's what a 30-year-old would believe, probably what I'd believe. I'm 58. So a couple of weeks later, he gets the word back, there's no interest in H&Q Asia Pacific. About this same time, coterminous with this, Dr. Suh says, oh, gosh, I've got really bad news. Sorry to hear that there's no money, but a Canadian group has got it locked up, so don't do any more work. And it's undisputed in the record. Dr. Suh doesn't challenge that. And John Norman says, well, what about another investment banking group, because Ainsworth will go get somebody else. He says, no, that would be futile. Stop. Okay, if any of that was true, then we're where we are. And Mr. Ainsworth says they did very little after that, nothing, because they were totally discouraged. What we don't have, though, is any kind of subsequent disclosure when sometime in June and July, the deal is admittedly by Mr. Lee presented to H&Q AP, to him, not to H&Q AP. It finally gets to him at the top, June or July after this April dead in the water report. What's the inference there? Is this two months? Is this project died and has Dr. Suh disappeared and has the project disappeared? No, because what you all know, what we all know in this courtroom, is Dr. Suh got to be the CEO. Dr. Suh got 300,000 warrants. H&Q ended up being a 15 percent owner through the APGF3 partnership fund that H&Q Asia Pacific managed. H&Q Asia Pacific became a major investor, about 14 percent. So you start in the beginning and you say, okay, this guy wanted to be CEO and he wanted to figure out a way to get control of the stock of this company, G&G Telecom, and it happened. And all the players are in place, but the train left the station and Goodworth was still standing on his side. Now, the judge, for whatever reason, in his summary judgment evaluations, accepts things that Suh says about, okay, I controvert. We didn't have a joint venture. I never had an agreement with Goodworth. But you also know the judge found that Dr. Suh did not do real well with integrity and he called his testimony an indicia of falsity. A very PC term for a man that just didn't tell the truth under oath. We also, coterminously with this, were having problems getting documents. In fact, Dr. Suh's counsel, who owed us documents on Rule 26A disclosure date of January 31, 19 or January 31 of 2002, didn't finish producing until July and really made the first production in May. And we tried. I put the emails in the record at MMO and we tried. Would you please, because I don't know what it is here. I got ripped here, but in Texas the judges are really big on us trying to work amicably with counsel and give extensions that are reasonable as long as you're not sacrificing your client's rights. And I tried. And we got some very important documents all the way through July. Cutoff was August 2. We had another problem right before the cutoff. That is that we had documents we were subpoenaing from H&Q Asia Pacific. This is the company, the big partner. Suh was involved with them. It's the company that we sent our proposal to through H&Q. But they just refused to show. I don't know what their excuse is, but they finally, because we had to sue them to stop limitations from running on that defendant, the other defendants would not allow their joinder. And lo and behold, on November 27, we get a slew of documents. This is after a summary judgment has been rendered against us. And you saw what the district court said in its opinion. Dr. Suh, who did admittedly lie in his deposition about a secret agreement, Dr. Suh was merely an Internet consultant who had nothing to do until the end of November of 1999 when, whew, there had been a purchase of stock, he found out, and he was appointed CEO later. That's not what happened. And so we filed a Rule 59E motion with the court and we said, you know, you've been hoodwinked, Your Honor. And the secret document is 110B in your record. I don't know what the rules are, so I won't read exactly from it if the court doesn't have any objection. Was he the Internet consultant, just a friend of the G&G Telecom people? Well, he tells H&QAP enough that they write that the transaction was initiated by Suh in 1998. It was. That's when he contacted Goodworth. That's when it started. He was not the Internet consultant. And in the same document again, which is 110-B, and please read it, he started a consortium of local investors to get this thing underway. Suh, our joint venturer, who says the deal's dead. Gentlemen, this is time-worn and it's so old. It's so old. People that are greedy wanting to take other people that are not necessary out of the middle of a transaction. It's so old. And all the footprints are everywhere. I mean, he started it. This is the internal H&QAP document. The local investors approached PAMA, not this Mr. Chung, who had never been disclosed to us. You know, the whole, everything the judge believed was completely untrue. And so we filed the Rule 59e, and we said, Your Honor, please, you still have time. Let's get this straight. These documents show they've misled you further. So we had a lie over his involvement. And the lie was really important, too, because the September 6, 1999 document, about three or four months after it said the deal was dead, at a time when he's telling the court that he's an Internet consultant for G&G only, not even a formal position, is secret, and it shows his involvement deeply with PAMA Prudential. There are no two ways about it. He was a driving force. And that's what 110b says. As to H&QAP, he was a driving force. In fact, not only was he the driving force, this memo says he wants us to take out PAMA, and the local investors run by him will give us their control, will get control of the deal. Is Goodworth Holding still a corporation, or has it been defunct? It is a defunct corporation now, Your Honor. It is not operating. It's still a valid corporation? It is not. It's a Dallas, Texas operation. It was primarily a hedge fund trading company, and it's out of business now. Well, how can they sue them if they're not? Well, they still have legal rights. What's that? They still have legal rights. They have the rights to assert this lawsuit. They've got the standing to assert this lawsuit. If they don't exist, how can they? They're not operating, Your Honor. If they don't exist, how can they have a right? Oh, I didn't mean to say they don't exist. They have standing to bring this. They are the only ones. And under Texas law, by the way, for three years after a corporation goes out of business, they can bring their claims and you can bring your claims against them, even after a charter is forfeited. We're still within that time frame. The charter hasn't been forfeited? I don't know that it's been forfeited at all. It's not part of the evidence. But it is the entity which has the claim, and it is the entity that is bringing the action. Now, you just stimulated me because I wasn't thinking about all this. There was an assignment by Goodworth at a time when it was in good standing to Ainsworth and Norman, and I believe Mr. Ainsworth's father. So they would be considered the real parties in interest at this time. The company had no more money to push the case. So I'm going to stand corrected because that transaction did occur. And now Mr. Norman has part of it, and the two Ainsworths have part of the cause of action, although it's asserted in the name of the party that had it. How do we know that in all of these transactions, Ainsworth was acting on behalf of Goodworth or acting on his own? Because he never acted on his own. How do we know that? Because Goodworth was what Norman referred him to. When did the corporation become defunct? Oh, long after this. Was that? Long after this, 2002. Long after this? Yes, sir. And, in fact, Goodworth is the only entity that you saw in this record. If you remember, Mr. Gall has transmitted the business proposal on February 22, 1999. It has a cover letter. And he says it closed as a business proposal with regard to a joint venture between Goodworth Holdings and Dr. Suh. Nobody has ever questioned that there was any other entity. And it's always been that way. That was from the lawyer who was helping the deal. And the lawyer was also working with Dr. Suh at the instructions of Goodworth. And he so testified. I thought the judges asked funny questions. That's all right, Your Honor. I'm here to answer your questions more than to tell you what I know, believe me. Yes, Your Honor? There was a joint venture proposal that the lawyers prepared and sent for the telephone conference. And it said, here are the terms of the joint venture. And if it's not accepted by whatever day, a day or two later, then it's over. And that wasn't accepted. What's the answer to that? The answer is that was not the joint venture. Mr. Gaulda testified about it. He did at Exhibit 52E, pages 62 and 63. This is one possible vehicle for this joint venture to carry out its goal. The whole idea of this acquisition court was that because of Dr. Suh's good close relationship with these people at G&G and the government, that he could go tie down the stock. Then they would take that contract, because they didn't have any money, and go over to G&G and say, or whoever else, and say, we've got the stock tied up. If you want to fund this thing, this is the basis for doing it. And it was kept. But, sir, if that doesn't represent the joint venture agreement, then explain to me the essential terms of the joint venture as you believe them to be. It was just as simple as Weiner, Boyd, and all the other cases out here, Your Honor. It was people who had a solid, concrete, discreet goal, and it was to acquire the majority shares and control the company. That was it, and they were going to split profits 50-50, and both of them had something broke, basically, and so they were going to carry their own flight expenses, and Goodworth was providing a lawyer to at least look at this. And the written proposal was simply a method to carry that out? It was one, and so stated by Mr. Ainsworth and Mr. Gaulda. Mr. Gaulda pointed out something. If you look at that proposal, it's conditioned on hope of being willing to negotiate with that acquisition corp. He said, you wouldn't have that in a joint venture agreement. That's not part of what ventures are talking about. They make the decision to go for it. Once they make the decision to go for it and figure out how they're going to split profits, how they're going to take care of cost, and what's going to happen, what the goal is. But once they were unable to agree upon the specific written terms, how were they then going to carry out their joint venture? Well, for one thing, Mr. Ainsworth very directly said, we don't know. H&Q may not want to use this at all. I mean, if they got the contract, H&Q is probably going to say, and he said he and Dr. Sub talked about it, that they're not going for it. They're going to structure it another way. This was just trying to get the ball rolling because Dr. Sub was in a hurry. But the money always determines the structure. It always does. The only way that you can control or tether the money is to have a nondisclosure or confidentiality agreement so that they can't do the deal unless they deal with you fairly. But the money always makes the decision. They have tax issues and foreign laws and domestic laws. There would be no way. But our group was trying to go tie down the stock. It's floating. They just wanted to tie it down. They couldn't buy it. So, no, it wasn't the joint venture because the joint venture was to go find somebody with money that would say, yes, we'll go for this. So the joint venture was to go find somebody who has the money. Yes, sir. To accomplish this goal. Yes, sir. That's exactly right. And Dr. Sub wanted to be CEO. He got his wish. And he also got 300,000 warrants later. Now, suppose that you were to, you know, in the district court's order, suppose that you were to, we were to agree that there might be a tribal issue of fact over whether or not there was a joint venture. Yes, sir. The district court also said that you could never prove any damages. What's your response to that? My response is the district court, bless his heart, a charming man, by the way, but he missed this one, too. And from a damage standpoint, we've got so many sites. 52T, the Chris Ainsworth Affidavit at 12 and 13, 28 to 40. Exhibit 72B, Chris Ainsworth's Affidavit at paragraphs 35 and 87. A 20 percent interest was reserved out of whatever the financial underwriting consortium obtained. Now, that would be high for somebody saying, hey, I've got an idea. I mean, I'll be frank with you, it would be really high, except Dr. Sub was part of the package. They didn't have to use Sub, but he's extremely bright in his special area, and he promoted himself. I mean, you've read the stuff, I'm sure. He promoted himself. And so they got more than just Goodworth. Goodworth was sharing with Dr. Sub, and then, as you know, there's a memorandum of understanding with John Norman, and they shared 45-45 with 10 percent to be negotiated later. Goodworth shared with everybody. But the goal was to go find the financial underwriting. Yes, there is a joint venture there. There's also a confidentiality agreement. And to this date ---- Could you have a claim about how much Goodworth would be entitled to? Not really, because it's 50-50 on 20 percent reserved. And we do have some documents, H&Q did in August, after the discovery cutoff, give us some documents so that we could see that the first tranche of monies was 56 million. So that's just to the H&Q AP managed funds. There's also PAMA and others. But, of course, Goodworth was not included, and it was not part of the negotiations. But, no, it had 20 percent reserved, right. All the parties that started ended up ---- Do the investors, do you know if the investors that ultimately invested in this, did they agree to the 20 percent reserved? That's the way it was transmitted to H&Q, and it was never negotiated or anything. They said they didn't have any interest. But they did end up doing the deal. They did negotiate. And, you know, they didn't have to negotiate if they didn't intend to. Well, the investors that ultimately, you know, went with the deal, did they agree to the 20 percent reserved? It was given to H&Q, who said they gave it to H&Q AP. That was how the project moved forward. Mr. Lee, another late disclosed witness, said he got his ---- Who's going to pay this 20 percent reserved? The 20 percent? Yeah. Well, H&Q and Dr. Sutt. Dr. Sutt operated this whole thing forever. Okay. You've got two different people, two different claims, and I've got two seconds. Okay. We're going to give you time for rebuttal. Thank you. Good morning, Your Honors. My name is Michael Scalacci. I'm here for Kimman Park on behalf of Dr. M.W. Sutt. If it please the Court, with all due respect to the passionate arguments of Mr. Boyd, if the plain language of written documents still means something, if party admissions still means something, and if the court's rules and orders still mean something, then the lower court's rulings in this case were unquestionably correct. Let me first just try and address some of the comments that Mr. Boyd made on behalf of Goodworth. Goodworth has repeatedly alleged in their opening brief and their reply brief and hereon oral argument that the district court, for some mysterious reason, just accepted whatever Dr. Sutt had to say and didn't accept what Chris Ainsworth and John Norman and Richard Ainsworth had to say and Mr. Galda. That's simply not true. The court didn't have to rely on what Dr. Sutt had to say. The court had admissions from Goodworth to rely on and it had the plain language of the term sheet to rely on. The argument that the term sheet was just one vehicle or one mechanism by which this joint venture would be carried out is clearly not correct. If we look at the term sheet, it actually states under the obligations of Sutt that one of his obligations would be, if they entered into this, to develop an appropriate structure for the acquisition of the shares. That was going to be one of his obligations. This document is not a structure for the acquisition of the shares. This document is the joint venture agreement. And Mr. Galda, the attorney on behalf of Goodworth, of course, did not say that this was merely one vehicle. The language has been highlighted by everyone in the record. Mr. Galda said this was to govern the relationship between the parties. And in the Galda deposition, he was shown this document and at page 65 of the deposition he says, you know, I'm reading this. This does relate to the relationship between Goodworth and Sutt. He goes on on page 66 to say, you know, it was intended to be a term sheet, not the final organization of the joint venture. So the joint venture wasn't even formed yet, and this term sheet, even if it had been signed, was meant to be a guideline to form the joint venture finally. And then he goes on to say, on page 78 of his deposition, that we were asked by Chris Ainsworth to try to put together an actual formal agreement respecting their obligations to each other. This is unequivocal what Mr. Galda is saying. That's what this document was. It was a they were verbally talking to each other. They had not yet come to terms. And Chris Ainsworth of Goodworth asked Mr. Galda to prepare this term sheet so they could sign something reflecting their relationship. It's also interesting that this term sheet contains a no-shop clause. They're asking Dr. Suh in this offer, which is what Mr. Galda characterized it as, they're asking Dr. Suh to agree to a no-shop provision. If they already had a joint venture formed between each other, they already have this. They already have the obligation not to go shopping around elsewhere once they've had a joint venture. Kennedy. Well, a joint venture can be oral, right? Yes, it can, of course. And if what you say is that the purpose of this was to put into writing the terms of a joint venture, that's not inconsistent with having reached an oral agreement and then trying to get it incorporated into a written document. That's true. But where is the evidence of the joint venture? This document clearly indicates that there was none yet. The document itself indicates that there was none yet. For example, John Norman's name is on this document. According to Chris Ainsworth from Goodworth, he insists that John Norman was not going to be part of the joint venture. Here his name is. It says on the term sheet, Norman ownership question mark, in brackets, with the 50 percent split that Mr. Boyd insists was agreed on in brackets. Obviously, the parties had not agreed on who the participants were yet. They had not agreed on the split yet for sure. And in fact, Mr. Galda testified in his deposition, yes, this indicates that Mr. Norman may have been part of this or may not have been part of this. These were issues to discuss. In fact, the cover letter itself says that there are issues obviously still to be discussed. Now, even if there was an oral joint venture already in existence at the time this term sheet was presented, and this was intended to formalize the agreement, when the parties declined to sign this, when they had disputes and declined to sign this, any agreement they may have had terminated at that point, obviously. They could not agree to go forward. Bear in mind, the main point of contention that they had when this term sheet was discussed was how are they going to get COPA to divest these shares privately to us without going through the public bidding process. And Dr. Suh's business plan that he prepared makes reference to influencing the Ministry of Industry. When they had this, the telephone conference surrounding this term sheet, they specifically discussed the idea that we may have to make some gratuities to these officials in order for them to agree to sell us these shares. Chris Ainsworth, Mr. Galda, it's very clear in the record, they all said, well, we can't do that, we're not going to do that, that would be illegal, we're not going to do it. They couldn't come to an agreement. Richard Ainsworth said, I had questions about what John Norman's role was. They couldn't come to an agreement about that. Even if there somehow was some oral joint venture already existing, which there's no evidence of, it clearly ended when they couldn't come to terms in the writing that the parties intended to reflect their agreement. And when parties intend that their oral agreement will then be reflected in writing and they fail to sign the writing, you no longer have any agreement, and that's at best what happened here. One other point that I wanted to make is that, and I know that Mr. Balabanian has some comments to make about this, I just wanted to address it very briefly regarding the speculative nature of the damages here. Not only has Goodworth not been able to show how much damages they suffered or would have suffered, there's no evidence that the Ministry of Industry would have been susceptible to the influence that they were going to try to present to them. There's no evidence whatsoever that COPA would have been willing to violate their own government regulations about submitting this as a public bidding process and sell the shares privately. There's no evidence of any of that. There's no evidence that Goodworth would have won the bid even if they had been participating in the public bidding process. That's all entirely speculative. Given the fact that the ultimate transaction that went down was very different than what these parties were contemplating, we have so much speculation involved here that as a matter of law, we cannot possibly let the claim go forward. And finally, one more point. I'm going to ask you one thing here. What they were discussing in the plan was that this H&Q or whatever it was would be, would finance the deal. And H&Q then said, well, we're not interested. Maybe H&Q West is. And so the material was sent to H&Q West. Now, was the original plan of whatever, let's call it a joint venture for the moment, of the people involved in these discussions, the original plan was for who to act, who would actually acquire ownership of the stock under the supposed joint venture? Well, that's a good question. Who owned the stock? As I understand this ambiguous joint venture that was out there somewhere, the investors would actually be acquiring the shares. H&Q West would acquire the stock. Who did actually acquire the stock? A consortium of different investors, H&QAP being one of them, PAMA being the other, and a group of local investors. They acquired the shares. They put up the money and acquired the shares. In this deal, bear in mind, Goodworth was never intending to put up any of its money. And Goodworth was intending to get a part of, they would hope to get from H&Q with Mr. Sue, 20 percent. That was their aim, to get that deal. That's as I understand it. But they might have been happy to get even 10 percent or maybe several million dollars. That would have to be negotiated in the future. That's right. And, okay. So what happened to the confidentiality agreement with H&Q West that they would not use this material? To be honest with you, Your Honor, I know that Mr. Balabanian wants to comment on that. That's his client. But I will briefly just say that if you look at the allegation that somehow says business plan was used later on by H&QAP, there's no evidence of that. The business plan that was prepared later on has various information in it that was submitted to the public so that they could analyze the company in order to bid on it. The idea that the two business plans were identical is simply not true. I hesitate to even go there because that evidence wasn't even before the lower court. I see that I'm out of time, and I don't want to encroach on Mr. Balabanian's time, so I'll let him come up to the podium now. Thank you very much. May it please the Court, David Balabanian for J.P. Morgan Securities, Inc. It is undisputed that the proposed joint venture agreement was never signed. There's a dispute as to why. Goodworth claims it was because of a dispute over whether bribes were going to be paid to the Korean government. But for present purposes, it doesn't matter. There was no agreement. There was a proposal. The proposal contained within it not one, but two drop-dead dates. It had to be signed, as Your Honor noted, by the next day or else there would be no obligation. Within the joint venture proposal itself was a further drop-dead date that the claimant Well, even that, though, that's one person saying if you don't sign it, there's no further obligation. But nobody signed anything that said that. Nobody signed anything. So there's no So there's no effect to that drop-dead date, is there? Your Honor, the one thing that's clear is one cannot premise an agreement on the proposed joint venture. So we have to find it somewhere else. On the written document. That's correct. We have to find it somewhere else in the ether. Now, the fact that the parties contemplate reducing it to writing, as they obviously did, and do not do so is under the applicable case law itself a solid reason for concluding that they have no agreement. But there's more than that. The lawyer who proposed this draft was asked about it, was asked whether what its function was. And he testified. His testimony is set forth in supplemental excerpts of record at pages 196 to 98. And there he testifies as to what his purpose was in preparing this draft. And he makes it clear that this was not just a proposal, an idea, something to that was parallel to or in addition to this ethereal joint venture, but was the very means intended to be, the very means by which the parties would go forward if they were going to go forward, and the means by which he was going to determine if there existed a basis for going forward. The lawyer I'm referring to is Goodworth's lawyer who actually prepared the draft. And this is what he said. Dr. S, Dr. Suh, and Goodworth were working together to devise a strategy to buy the shares. That went on without a formal written agreement. We were asked by Chris Ainsworth, the principal of Goodworth, to try to put together an actual formal agreement respecting their obligations to each other. The first step to writing a formal agreement is getting a clear understanding from all the parties what the terms of the agreement are. So I would customarily provide a term sheet. And in some cases, not in all cases, I would ask people to sign on to the term sheet so that the lawyers drafting the definitive agreements know exactly what the deal is and are not wasting people's time. That's his purpose in drafting it. He sought to memorialize in that draft proposal this ethereal agreement that the parties, he says, had been working under, submitted it to the parties, and it was rejected. And it was rejected by both sides. And after that, there was no further dealings. But even if somehow or other this agreement, which the parties did not enter into and declined to sign, continued in some phantom form, it is undisputed that it ended in April, when, according to Mr. Ainsworth himself, he determined that there would be no further activities under this joint venture because he claims, he was told by Dr. Suh, that some Canadians had locked up the deal. Now, that's in dispute. But from the standpoint of my client, J.P. Morgan, it really doesn't matter, because all the claims against Morgan are based on the notion that there was a joint venture that continued. From our perspective, at that point that Mr. Ainsworth says the deal is off because I've been told something about the Canadians, whatever claim he has has now turned into a fraud claim against Dr. Suh. It cannot support a claim against Morgan based on this nonexistent, hypothetical, ethereal joint venture, which was never memorialized, and it's more than not being memorialized. The parties explicitly determined not to sign the document which the lawyer said he prepared for the express reason of determining whether there was, in fact, a basis for going forward. Because the agreement, and as counsel for Dr. Suh points out, the contents of the proposed agreement themselves are wholly inconsistent with this ethereal joint venture. Why would you have a no-shop clause in the proposal if there was already an agreement of some kind of exclusive dealing? It would be redundant. So both the contents of the document, the fact that it was not signed, and the fact that we have no terms of this phantom agreement put the Court in a position where there is no basis for upholding the claim, nor would there be any basis whatever for calculating damages. What are the terms of this ethereal agreement? The fact that the term sheet itself contains all the express provisions, sharing, identity of parties, timing, all of the constituent elements that you would expect in a joint venture, demonstrates how devoid of any content this ethereal agreement really is. In fact, Mr. Ainsworth himself testified that the term sheet was, as he put it, simply a wish list. Hard to say you have agreement if you're still making wishes. This is what he said. The odds of us getting a deal done like that, the term sheet, the odds of J.P. Morgan funding us that way and giving us control of it was very unlikely. But that was our wish list, this testimony is. Well, does that mean that if you have a joint venture, you say we're going to become a contract where the investor will give us 20 percent? Does that mean you don't have any deal because unless the investor gives you 20 percent, if the investor gives you 15 percent? No, Your Honor. You don't still have a joint venture? No. It's not because the investor didn't put up the money. It's because the purported joint ventures never reached agreement on any such deal. But you reach agreement on what you would like to get as your fee in the deal. They reached agreement at most on their desire to put together a proposal. No, I'm only asking you about the fact that you say that because it's a wish list, because they say what they hope to get out in return from the investor, that somehow that means you can't have a joint venture. If that's not a realistic expectation. The deal you do has no relationship to what the deal that you talked about. That's a relationship. You say, look, we hope we'll get in return as our fee 20 percent, even though it's unlikely you'll get more than 10 percent. Does that make a difference to whether you have a joint venture? No, Your Honor, but that's not what happened here. First, there is no joint venture. We don't know the terms of it. Second, the transaction in which Goodworth claims some right to share, there's no relationship to the transaction that was the subject of this wish list. That was a bribe-based $6 share deal done privately without public bidding. Otherwise, obviously, the bribe strategy wouldn't work. The deal ultimately done, it's important to have in mind that it was not done by Morgan at all. It was done by a company, a remote affiliate, a relationship between the company that received the business plan and executed the confidentiality agreement. And the company which was a part of a consortium that did an entirely different deal is as follows. The company that received the business plan and executed the agreement was owned by another company, which owned 15 percent of the company that was part of the consortium. So to hold Morgan liable for anything that was done by the AP company would require double piercing of the corporate veil, for which there is no support in the record at all. The deal ultimately done was not only done on a different basis. It was done through a different process. It was done through public bidding. Mr. Ainsworth and his counsel testified they had no interest in a transaction that required public bidding, and, indeed, that's why the negotiations fell apart, because it became clear to them that Dr. Seo's proposal was based on bribery, which would itself provide a full and complete defense where any other needed. You can't sue on an illegal contract. And the deal which was proposed to and was under discussion was a deal that involved bribing Korean government officials. That deal was not accepted. There was no further discussions. No later than April, Mr. Ainsworth himself says the deal is off. He has a claim against Dr. Seo. I'm not here to address that, but I can tell the Court that as from the standpoint of Morgan, there is no basis whatever for holding it in this case. The only thing it did was receive a business plan during the glory days when they were getting 20 a day, signed a confidentiality agreement, and as far as they were there was no further involvement with it. Months later, a remotely affiliated corporation becomes part of the consortium. Thank you, Your Honor. Thank you, Counsel. There's never enough time, and I'm glad my wife said yes very quickly. First of all, there is not a single H&Q witness that has ever controverted Goodworth or Ainsworth. Not one. About the transmittal of the business plan, not one. About discussions about protecting Goodworth, all of that's in Chris Ainsworth's affidavits. It's there. They could have controverted it. There's not one H&Q witness that controverted it. Number two, public versus private. You heard counsel tell you that it's a different deal and all that. That's all poppycock. Number one, he said that Joe Gaulda said, this deal is different and we tried to set it up one way or the other. What Joe Gaulda said at Exhibit 52F, pages 53 to 55, is public or private didn't matter. I mean, if it made sense, public, part public, and this was not one way or the other. They had, if you'll read that secret document that I read to you a little bit earlier, they achieved basically 86% control with the local investors. But this is not a public bid. That's only 26% of the stock they ended up getting, 44% or whatever. Hama bought 10% and they got other private stocks. This consortium that went together, that was driven by Suh. Look at that November 6, 1999 secret agreement that he lied about in his deposition. He drove it. He was a joint venturer. The deal was to get control of the stock and get control of the company. He drove it all the way. H&Q AP and H&Q both got, I mean, if Joe Gaulda hadn't have faxed that proposal, I'm sure we'd hear that they never got the proposal. But they did get it. And not one H&Q witness has ever come forward to say, we didn't tell Goodworth that we would protect them. They didn't deny any of those things as we sit here today. So where are the inferences? Now, public versus private, I've got more, but Joe Gaulda's enough. But Chris Ainsworth also, 72B, paragraphs 28 and 29, said it didn't make any difference, public or private. Private looked cheaper, looked like we could get the money interested more easily. But the money was really interested, and please read that secret document that I read to you a little bit earlier from, because you'll see they expected a 50 to 100% or something like that internal rate of return. Also one of the other secret documents in the 110 category is an analysis in its minutes of a meeting with Dr. Suh, they expected to go 4 billion IPO in two years on the NASDAQ. Now, how do we know about valuation here? Because H&Q finally, in August, well after the discovery cutoff, gave us some financial documents. That's the first time we learned about how much there really was put into this thing. But there was a lot more after that, hundreds of millions of dollars. Now, I've got to tell you, no matter what the deal was, if you're H&Q and you take it and you're told the deal's a 20% reserved interest and the CEO would like to assume the position, and you take the deal, and then you report back no interest, and you say, but I'll send it to my Asia Pacific group, and then you report back no interest, and So as the CEO, we in this courtroom know what happened, and the judge used the wrong standards in summary judgment evaluation. The evidence is there, and before a jury, the evidence will validate a judgment. And I thank you very much for your time. If you have any other questions, I'd love to have 10 minutes, but I don't have it, so. Thank you very much. We ask that you reverse the remand, that you vacate, also reverse the discovery orders that we complained about, Rule 45 and the Rule 59E. Thank you very much, Your Honor. Thank you. Thank you all. The case is here. You will be submitted. The next case on the calendar is Beaches v. Placer County. Mr. Levy. Thank you. Good morning. James Carr for the appellant, which is the Placer County Air Pollution Control District. I wish to make it clear to the court that it is not the county of Placer that is involved in this litigation. The district court, Eastern District of California, denied our motion for summary judgment based on the 11th Amendment, sovereign immunity, which we were claiming for the Placer County Air Pollution Control District, as well as on state sovereign immunity. We filed our appeal of that, and that's why we're here today. The appellant, at least it's our contention, the appellant is an arm of the state of California. It is one of the 35 pollution control enforcement districts that are
judges: Ferguson, Reinhardt, Paez